IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| INOVATEUS SOLAR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-578 |
| | ) | |
| QBE INSURANCE CORPORATION | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Inovateus Solar, LLC ("Inovateus"), by and through its counsel, for its Complaint against Defendant QBE Insurance Corporation ("QBE"), states as follows:

## PARTIES, JURISDICTION AND VENUE

1.       Inovateus is an Indiana limited liability company organized and existing under the laws of the State of Indiana with its principal place of business in South Bend, Indiana.

2.       The members of Inovateus are: George Howard, a citizen of Indiana; Kanczuzewski Solar Holdings, Inc., an Indiana corporation with its principal place of business in Indiana; Middleburg Capital Development Ltd., a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Virginia; and Sterling Power Opportunities, LLC, a limited liability company organized and existing under the laws of the State of Delaware.  The only member of Sterling Power Opportunities, LLC is Galaway Sustainable Capital, Inc., a corporation organized and exiting under the laws of the State of Delaware, with its principal place of business in the State of Colorado and the District of Columbia.

3.       QBE is a Pennsylvania corporation with its principal place of business in the City of New York, in the State of New York.

1

4.     This Court has subject matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties, and the amount in controversy (as described below) exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this Court, the United States District Court for the Southern District of Illinois, under 28 U.S.C. §1391(b)(2) because the project that is subject to the construction contract secured by the bonds at issue is located in this District, and because a substantial part of the events or acts giving rise to Inovateus's claim occurred in this District.

## THE CLENDENIN PROJECT

6.     On  August 7, 2020, Inovateus as the "Contractor" and Clendenin A Community Solar LLC as the "Owner" entered into an Engineering Procurement and Construction Contract (the "EPC") for the design, engineering, procurement and general contractor services for a solar power construction project at 820 E. Mine B Rd., Herrin, Illinois  (the "Clendenin Project").  A true and accurate copy of the EPC is attached as Exhibit 2.

7.     On September 25, 2020, Inovateus as "Contractor" and Catalyst as "Subcontractor" entered into a contract in which Catalyst agreed to perform certain construction-related work on the Clendenin Project, including all mechanical and electrical installation, roadway, erosion control, fence, final vegetative seeding, riser pole, and full installation through MV connection on utility pole, for a 2000kWac/2.91 MW DC solar installation at the Clendenin Project (the "Subcontract").  The Subcontract includes the Job Order No. 13320, the Master Subcontract Agreement ("MSA"), the Scope of Work, the Project Documents, the Schedule of Values & LDs, and the Partial and Final Waiver and Release Forms. A true and accurate copy of the Subcontract, but not including the voluminous "Project Documents" section, is attached as Exhibit 1.  Pursuant

to §1.1 of the MSA, the Contract Documents for the Clendenin Project also included the EPC. A true and accurate copy of the EPC is attached as Exhibit 2.

8.      According to §1.3 of the MSA, Catalyst agreed "to assume toward [Inovateus] all of the obligations and the responsibilities that [Inovateus] by the Contract Documents assumes toward the Owner, and [Inovateus] shall . . . have the same rights and remedies against [Catalyst] that the Owner has against [Inovateus] under the Contract Documents as though the terms of those documents were set forth in full in this Master Agreement." (Ex. 1).

9.      Pursuant to §9.3 of the MSA, Catalyst furnished a payment bond (the "Payment Bond") and a performance bond (the "Performance Bond") for the Clendenin Project issued by QBE, and naming Catalyst as the "Principal," QBE as the "Obligor," and Inovateus as the "Obligee." True and accurate copies of the Payment Bond and the Performance Bond are attached as Exhibits 3 and 4, respectively.

10.     The Subcontract is incorporated by reference in the Payment Bond and the Performance Bond. (Ex. 3 §1; Ex. 4 §1).

11.     The Subcontract (Ex. 1), the EPC (Ex. 2), the Payment Bond (Ex. 3), the Performance Bond (Ex. 4), and Change Orders comprise the obligations between Inovateus, Catalyst, and QBE regarding the Clendenin Project.

## THE ARBITRATION

12.     On March 22, 2022, Inovateus filed an Arbitration Complaint with the American Arbitration Association, Construction Industry Arbitration Tribunal, titled Inovateus Solar, LLC v. Danna LLC d/b/a Catalyst Modern Energy and QBE Insurance Corporation (the "Arbitration Complaint"). A true and accurate copy of the Arbitration Complaint (but without Exhibits) is attached as Exhibit 11.

13.     In the Arbitration Complaint, Inovateus asserted claims for breach of contract, breach of warranty, negligence, and breach of the Payment Bond and Performance Bond related to the Kern Project.

14.     The MSA contains an arbitration clause which states in pertinent part:

> All claims, disputes and other matters in controversy arising out of or related to this Master Agreement, or the performance or breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect, but as modified by this Article, unless the parties mutually agree otherwise. … Unless otherwise agreed by [Inovateus], the arbitration proceeding shall take place in South Bend, Indiana. The arbitrators may decide only the issues presented to them and may not vary or disregard any terms of this Master Agreement or the Contract Documents. This agreement to arbitrate shall be binding, and judgment may be entered upon the arbitration award in accordance with applicable law in any court having jurisdiction thereof. The arbitration award shall be as binding upon [Catalyst's] sureties as if such sureties were named and joined in the arbitration proceeding, and at [Inovateus's] option, such sureties may be joined as parties therein.

(Ex. 2, §12.2).

15.     The Payment Bond states that a suit or action under the Payment Bond be commenced "in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located on or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever (1) or (2) first occurs." (Ex. 3, §12).

16.     The Performance Bond states that "any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligation under this Bond, whichever occurs first."  (Ex. 4, §11).

17.     Because the Payment Bond and the Performance Bond incorporate the Subcontract by reference, QBE is bound by the arbitration provision in the Subcontract, and is a proper party to the Arbitration Complaint.

18.     Without waiving any of its rights to enforce the arbitration clause of the MSA against QBE, Inovateus has filed this Lawsuit in order to toll the contractual limitations periods in the Payment Bond and the Performance Bond, in order to protect its rights and claims against QBE, in the event that QBE contends that it is not bound by the arbitration clause in the Subcontract, or that not all of the claims are arbitrable.

**SUBCONTRACT TERMS**

19.     The original price to be paid to Catalyst in the MSA was $1,471,403.84. (Ex. 1, Job Order).

20.     Catalyst and Inovateus agreed to two Change Orders to increase the Contract price for the Clendenin Project to $1,510,944.17.

21.     Pursuant to §5.1 of the MSA, Catalyst agreed that it "shall perform the Work within the time allotted in the Project Agreement, the Job Order, or any subsequent Modifications in accordance with schedules issued by [Inovateus] from time to time …, to meet [Inovateus's] obligations under the [EPC]." (Ex. 1).

22.     The EPC set the Guaranteed Mechanical Completion Date for December 2, 2020 and the Guaranteed Substantial Completion Date for December 17, 2020. (Ex. 2, p. 4, Art. 6).

23.     In §5.2 of the MSA, Catalyst "acknowledge[d] that the Contract Time is a reasonable period for performing the Work and [Catalyst] shall complete the Work within the Contract Time.  The time of [Catalyst's] performance is of the essence of this Master Agreement." (Ex. 1).

24.     According to §6.2 of the EPC the "Contractor shall achieve Mechanical Completion on or before the Guaranteed Mechanical Completion Date and Substantial Completion on or before the Guaranteed Substantial Completion Date (as such dates may be adjusted as provided in this Agreement)." (Ex. 2).

25.     Catalyst knew that time was of the essence in the Subcontract because the realization of certain tax credits for investments in solar power facilities was dependent on reaching a set stage in the Work on the Clendenin Project by December 31, 2020.

## DELAYS AND TERMINATION

26.     On November 26, 2020, Catalyst requested an extension of the Guaranteed Mechanical Completion Date on the Clendenin Project to December 11, 2020 and an acceleration cost scenario through the time of that extension, which was accepted by Inovateus.  A true and accurate copy of Catalyst's proposal for the extension is attached as Exhibit 5.

27.     When Catalyst requested to extend the Guaranteed Mechanical Completion Date to December 11, 2020, it represented to Inovateus that the Work on the Clendenin Project was almost on schedule. Based on Catalyst's representation, Inovateus agreed to Catalyst's proposal for the extension of the Guaranteed Mechanical Completion Date to December 11, 2020.

28.     Catalyst did not reach Mechanical Completion on the Clendenin Project on or before December 11, 2020.

29.     On December 11, 2020, Catalyst informed Inovateus that it was not close to reaching Mechanical Completion. However, Catalyst represented to Inovateus that it could achieve Mechanical Completion by December 23, 2020. Inovateus did not agree to extend the Guaranteed Mechanical Completion Date, but in reliance on Catalyst's representation, Inovateus allowed Catalyst to continue to work to reach Mechanical Completion.

30.     On November 11, 2020, Inovateus received an email from an attorney for the IBEW Local 702 alleging concerns that workers hired for the Clendenin Project to perform installations were not qualified persons or electrical contractors or apprentices under the direct supervision of a qualified person.  The IBEW filed a Complaint with the Illinois Commerce Commission on November 16, 2020, asserting those allegations.

31.     In December 2020, Catalyst's laborers on the Clendenin Project claimed that they had not been paid by Catalyst and refused to work until they were paid.

32.     On December 23, 2020, Catalyst's work had not reached the point required for Mechanical Completion. Representatives of Inovateus had a telephone conference with Catalyst's President, Morgan Southard, and informed him that Inovateus would have to exercise its termination rights under the MSA. Mr. Southard said he would prepare a recovery plan to show how Catalyst could still reach Mechanical Substantial completion by December 27, 2020.

33.     Mr. Southard provided Catalyst's proposed recovery plan on the morning of December 24, 2020. However, while Catalyst's plan addressed two other projects, it did not address the Clendenin Project.  Inovateus informed Catalyst that the plan was insufficient and did not provide detailed information to give Inovateus confidence that Catalyst would reach Mechanical Completion by December 27, 2020.

34.     On December 24, 2020, Inovateus sent notification to Catalyst and QBE that it was considering terminating Catalyst from the Clendenin Project and requested a meeting on December 28, 2020 to discuss the issues and next steps (the "Consideration of Termination").  A true and accurate copy of the Consideration of Termination is attached as Exhibit 6.

35.     Neither QBE nor Catalyst responded to the Consideration of Termination.

36.     In March 2021, Inovateus began to receive information that some of Catalyst's subcontractors claimed that they had not been paid by Catalyst for work on the Clendenin Project

37.     In March 2021, Inovateus observed issues with the quality of the work performed by Catalyst on the Clendenin Project.

38.     On March 17 and 18, 2021, Solar FlexRack inspected the work on the Clendenin Project and identified a number of issues that needed to be repaired or remediated in order for the system to perform as expected.

39.     On March 20, 2021, Brandon Kuglin of Inovateus emailed Catalyst to inform it of the issues identified in the Solar FlexRack inspection and requested that Catalyst begin remediation work by March 23, 2021.  Catalyst responded by email sent the night of March 23, 2021, stated that the remediation efforts would take five workers five days to complete, but said that it would not perform the work without an executed and approved Change Order.

40.     On March 23, 2021, Inovateus, through its counsel, provided notice to Catalyst and QBE of the Subcontractor Claims, and requested payment of those under the Payment Bond (the "Subcontractor Claim Notice").  A true and accurate copy of the Subcontractor Claim Notice (without attachments) is attached as Exhibit 7.

41.     On March 24, 2021, Inovateus, through its counsel, sent a letter to Catalyst informing it that the amount of the Subcontractor Claims exceeded the unpaid balance of the MSA, and Inovateus intended to withhold all future payments to Catalyst until the Subcontractor Claims were resolved.  A true and accurate copy of the March 24, 2021 letter is attached as Exhibit 8.

42.     On March 25, 2021, Inovateus, through its counsel, sent a letter informing Catalyst that its refusal to perform the remediation work was a breach of the Subcontract, and that if Catalyst would not complete the remediation without additional compensation, then Inovateus would

terminate that part of the Job Order covering the remediation, effective March 27, 2021. A true and accurate copy of the March 25, 2021 letter is attached as Exhibit 9.

43.     In the March 27, 2021 letter (Exhibit 9), Inovateus also requested that Catalyst furnish it with adequate financial security or other equivalent proof of ability to perform the contractual obligations, pursuant to §3.2 of the MSA.

44.     On March 30, 2021, Catalyst and Inovateus agreed that Catalyst would perform some additional grounding work on the Clendenin Project, and as a part of that work, Inovateus would supply all material for the work, and Catalyst would submit a Change Order for the labor. However, when Catalyst provided the Change Order, it stated that it would need to be paid in advance because it was extended beyond its financial means, and Catalyst suggested that Inovateus have another contractor complete the additional grounding work. Inovateus agreed to retain a different contractor to perform the work.

45.     During the remediation work and the grounding work, additional issues with Catalyst's work on the Clendenin Project were identified.

46.     By April 9, 2021, Catalyst had not provided the information requested in the March 27, 2021, letter on its adequate financial security or other proof of ability to perform the contractual obligations by April 9, 2021.

47.     On April 9, 2021, Inovateus provided Catalyst with written notice of termination of the Clendenin Subcontract by reason of default (the "Termination Notice"), and provided a copy to QBE.  A true and accurate copy of the Termination Notice is attached as Exhibit 10.

48.     On April 12, 2021, Catalyst's counsel sent a letter to Inovateus' counsel stating that Catalyst disagreed with the reasons for termination, and that he would prepare a detailed formal response.  Catalyst never provided a detailed formal response to Inovateus's Termination Notice.

## ISI RETAINED AS REPLACEMENT CONTRACTOR

49.     Inovateus entered into a new contract with Interconnection Systems Incorporated ("ISI") to finish the Work under the scope of the Subcontract, to provide materials for that Work, and to bring that Work into conformity with the requirements of the Contract Documents.

50.     In §7.2(b) of the MSA, Catalyst and Inovateus agreed that in the event Inovateus terminated the Subcontract by reason of default, and Inovateus elected to employ another entity to finish the Work, then Inovateus would be entitled to withhold the unpaid balance of the MSA from Catalyst, and if the cost to finish the Work and bring it in conformity with the Contract Documents, plus any other costs and damages sustained by Inovateus by reason of such failure or lack of performance by Catalyst, including Inovateus's attorneys' fees and expenses, exceeded the Subcontract, then such excess shall be paid by Catalyst to Inovateus. (Ex. 1).

51.     Prior to its termination from the Clendenin Project, Catalyst submitted the following pay applications in the total amount of $1,220,233.57 for Work through the following dates and in the following amounts for its work on the Clendenin Project (the "Pay Applications"):

  a.  Pay Application #1, through 9/30/20, for $73,570.19;

  b.  Pay Application #2, through 10/5/20, for $147,140.38;

  c.  Pay Application #3, through 11/09/20, for $220,710.58;

  d.  Pay Application #4, through 11/11/20, for $73,570.19;

  e.  Pay Application #5, through 12/02/20, for $186,680.71;

  f.  Pay Application #6, through 12/09/20, for $147,140.38;

  g.  Pay Application #7, through 12/11/20, for $147,140.38;

  h.  Pay Application #8, through 1/14/21, for $147,140.38; and

  i.  Pay Application #9, through 1/31/21, for $77,140.38.

52.     Inovateus paid $1,222,146.08 for Catalyst's Pay Applications, in the following amounts on the following dates:

        a.     Pay Application #1, $73,570.19, paid on 11/11/20;

        b.     Pay Application #2, $147,140.38, paid on 11/11/20;

        c.     Pay Application #3, $220,710.58, paid on 12/10/20;

        d.     Pay Application #4, $73,570.19, paid on 12/10/20;

        e.     Pay Application #5, $186,680.71, paid on 1/14/21;

        f.     Pay Application #6, $147,140.38, paid on 1/27/21;

        g.     Pay Application #7, $147,140.38, paid on 3/04/21;

        h.     Pay Application #8, $149,052.89, paid on 3/04/21; and

        i.     Pay Application #9, $77,140.38, paid on 4/15/21.

53.     The additional $1,912.51 paid by Inovateus for Catalyst's Pay Applications resulted from Inovateus's overpayment of Pay Application #8.

54.     The difference between the amount of the Subcontract and the $1,222,146.08 of the Pay Applications paid by Inovateus is $288,798.09 (the "Remaining Contract Balance").

55.     Inovateus paid ISI $124,344.46 to complete the work within the scope of the MSA and to bring it into conformity with the MSA.

## NON-CONFORMING AND DEFECTIVE WORK

56.     As ISI began to complete the Work on the Clendenin Project, it discovered that some Work that had been completed by Catalyst was defective or not otherwise in conformity with the MSA, and needed to be repaired or redone.

57.     In §2.1 of the MSA, Catalyst agreed "to provide all labor, tools, equipment, material, supplies, utilities, transportation and supervision, and to do all things necessary, to

11

perform and complete the work and services specifically described [in the MSA], in a good and workmanlike manner and in accordance with the Contract Documents."  (Ex. 1).

58.     In §6.1 of the MSA, Catalyst "covenant[ed] and agree[d] to perform the work in a diligent, good and workmanlike manner and in accordance with the Contract Documents."  (Ex. 1)

59.     In the Scope of Work of the MSA, Section III.C.1(a), Catalyst agreed that its installation activity "shall be done in a professional, neat, and workmanlike manner, and shall comply with all applicable federal, state, and local codes."  (Ex. 1).

60.     In the Scope of Work of the MSA, Section III.C.3(a) and (b), Catalyst agreed that it would install panels "in a professional, neat, and workmanlike manner on the racks," that "the panels shall be installed and secured per the Manufacturer's Installation Guide Specifications," and that any panels "damaged during installation shall be the responsibility of [Catalyst] to replace."  (Ex. 1).

61.     The EPC §4.1 required that the Work "be performed … in accordance with: … (c) Prudent Industry Practices; and (d) the terms of the Contract Documents."  (Ex. 2).

62.     In §9.1 of the MSA, Catalyst warranted to the Owner and Inovateus that "all work under the Contract Documents shall be and remain of good quality and workmanship, free from faults, liens and defects, and shall be in strict conformance with the requirements and specifications in the Contract Documents.  [Catalyst] agrees to indemnify and hold Owner and [Inovateus] harmless from any cause or other damages or expenses (including attorneys' fees) resulting from any breach of the foregoing warranty."  (Ex. 1).

63.     In §9.1 of the MSA, Catalyst and Inovateus agreed that "all Work not conforming to the Contract Documents shall be considered defective. [Catalyst] shall bear all expenses

incurred in connection with the inspection, removal, repair, correction, handling and transportation of defective or nonconforming Work or Work whose acceptance has been revoked."  (Ex. 1).

64.     In §9.1 of the MSA, Catalyst and Inovateus agreed that the warranty provided therein "shall survive the… termination of any Job Order or this Master Agreement."  (Ex. 1).

65.     The non-conforming and defective work by Catalyst included, but was not limited to:

>    a.    Issues with some sector plate and cradle alignment, including rollers not parallel with the slope of the horizontal tube, some sector cradles were twisted with respect to the sector plate, and some sector plates were not centered between the sides of the sector cradle;
>
>    b.    Turn of nut connections were not turned after marked, or were not turned a full 1/3 of a turn past snug tight;
>
>    c.    Some dampener tube brackets were out of tolerance;
>
>    d.    Some vertical rails were installed directly over sector plates causing a high potential for the vertical rail to come into contact with the bearing cradle, hardware, or idler post;
>
>    e.    Some shoulder bolts were not installed fully within the cradle and some were missing the second lock nut;
>
>    f.    Some dampeners were contacting the bottom of the extended bracket;
>
>    g.    During testing after Mechanical Completion but before Substantial Completion, it was discovered that wiring was incorrect or backwards;
>
>    h.    Improper installation of DC String Feeders to the Combiner Boxes;
>
>    i.    Strings from sections of the array were terminated in the wrong Combiner Boxes;
>
>    j.    Issues requiring rework on the DAS side of the system after backfeed;
>
>    k.    Wiring issues with sensors in the DAS box;
>
>    l.    Modification of calibrated sensors;

m.      Mismatched orientation of upper and lower damper brackets.

66.     The defective and non-conforming work by Catalyst proximately caused Inovateus to incur additional costs to complete and repair the Work and caused further delays in the reaching Mechanical Completion and Substantial Completion on the Clendenin Project.

## LIQUIDATED DAMAGES

67.     In §5.3 of the MSA, Catalyst and Inovateus agreed that "if the Contract Documents provide for liquidated damages for delay beyond the completion date(s) set forth in the Contract Documents, and such liquidated damages are so assessed, then [Inovateus] may assess such damages against [Catalyst] in proportion to [Catalyst's] share of the responsibility for such delay, as determined by [Inovateus] in its reasonable discretion."  (Ex. 1).

68.     The EPC §6.2 provided for the recovery of Delay Liquidated Damages by the Owner if the Work on the Clendenin Project was not complete by the Guaranteed Mechanical Completion Date or the Guaranteed Substantial Completion Date.  (Ex. 2).

69.     The EPC provided for the accrual of Delay Liquidated Damages of $850/MWp/Day for each day that the Clendenin Project did not meet the Guaranteed Mechanical Completion Date or the Guaranteed Substantial Completion Date, which calculates to $2,434.54/day.  (Ex. 2, § 6.2, § 7.1, p. 4 Art. 7).

70.     The Clendenin Project reached Mechanical Completion on May 27, 2021, which was 167 days after the Guaranteed Mechanical Completion Date of December 11, 2020.

71.     The Delay Liquidated Damages for failure to meet the Mechanical Completion Date under the formula in the EPC were $406,568.18.

72.     Inovateus mitigated its damages by negotiating an agreement with the Owner to reduce the Delay Liquidated Damages for failing to meet the Guaranteed Mechanical Completion Date to $150,000.00.

73.     Inovateus and the Owner also agreed to set a new Guaranteed Substantial Completion Date of July 27, 2021, and later extended it to August 3, 2021.

74.     The Clendenin Project reached Substantial Completion on November 23, 2021, which was 113 days after the new Guaranteed Substantial Completion Date.

75.     The Owner originally claimed it was entitled to Delay Liquidated Damages in the amount of $275,103.02 against Inovateus for failing to meet the new Guaranteed Substantial Completion Date.

76.     Inovateus mitigated its damages by negotiating an agreement with the Owner to reduce the Delay Liquidated Damages for failing to meet the Guaranteed Substantial Completion date to $198,173.05.

## SUBCONTRACTOR LIENS AND UNPAID CLAIMS

77.     Catalyst entered into contracts with sub-subcontractors to perform some of the Work within the scope of the MSA.

78.     In §20.3 of the MSA, Catalyst and Inovateus agreed that Catalyst:

[S]hall save and keep the Project structures and improvements, the real estate within which the Project is situated, the interests of the Owner and all other persons in such Project and real estate, and the Contract Amount or other monies now due or hereafter to become due and payable by the Owner to [Inovateus], free from all mechanic's and other liens and from any claim against contract proceeds or notices to establish the personal liability of the Owner by reason of the Work or any labor, materials or other things used therein, and hereby. If [Catalyst] fails to remove any lien claim, or notice against the Owner or contract proceeds by any of its sub-subcontractors, suppliers or others for whom it is responsible, by bonding or otherwise, as directed by [Inovateus], [Inovateus] may retain sufficient funds out of any money due or thereafter become due by [Inovateus] to [Catalyst] to pay the same and all costs incurred by reason thereof and may pay or bond, such lien and costs out of any funds at any time in the hands of [Inovateus] and otherwise owing to [Catalyst].

(Ex. 1).

79.     The EPC §15.1 states that Inovateus:

15

> [W]arrants that, to the extent of timely payment by Owner to Contractor hereunder (a) it will keep the Project Site and the Facility free from liens and encumbrances of the Contractors and Subcontractors (excluding pre-lien notices). . .. Provided that Owner has remitted payments as and when due under this Agreement, if a Subcontractor files a lien against the Owner or the Facility, Contractor shall bond off or otherwise cause the release of the subject lien within thirty (30) days following receipt of notice of the lien.

(Ex. 2).

80.     The EPC §15.4 states:

> Provided that Owner has remitted payments as and when due under this Agreement, in the event of any . . . lien on the Equipment, Facility, or Site resulting from the action or inaction of [Inovateus'] Personnel, [Inovateus] shall promptly (a) at its own cost, defend Owner's title to the Work, Facility, Site and any Equipment; and (b) remove and discharge any such lien, claim,  . . . or other encumbrance from the Equipment, Facility, Work or the Site . . ..

(Ex. 2).

81.     The EPC §16.1 states, "[Inovateus] agrees to indemnify, defend, and hold harmless Owner Indemnitees, from and against (a) liens or other encumbrances on Owner, the Work, the Project Site, the Facility, or Owner's other property, arising out of or related to [Inovateus'] performance or breach of its obligations under this Agreement; [and]   (b) breaches of this Agreement by [Inovateus]. . .."  (Ex. 2).

82.     In §3.2 of the MSA, Catalyst agreed that before it would be entitled to any payment, it "shall pay for all materials, machinery, equipment and labor used in or in connection with, or other costs incurred in connection with, the performance of the [MSA] during the period covered by all previous applications for payment."  (Ex. 1).

83.     In March 2021, Inovateus learned that Catalyst had not paid some of its sub-subcontractors for Work on the Clendenin Project that was covered by Pay Applications that Inovateus had paid.

84.     The following subcontractors of Catalyst alleged that Catalyst had not paid amounts due to them for work on the Clendenin Project: WastEx, Inc.; Graybar Electric Company, Inc.; Sunbelt Rentals, Inc.; Triad Inc. America; Terrace Fence, Inc.; Elliott & Wood, Inc.; Chandler Concrete and Excavation;  American Wire Group; Chastain & Associates; United Rentals; and Reinhold Electric (the "Subcontractor Claims").

85.     Upon information and belief, Catalyst's subcontractors with Subcontractor Claims submitted Payment Bond claims to QBE under the Payment Bond.

86.     Inovateus, through its counsel, notified Catalyst and QBE of the Subcontractor Claims, and requested that they be resolved, or that Catalyst and QBE defend, indemnify, and hold Inovateus harmless from the Subcontractor Claims, pursuant to the Payment Bond.

87.     Sections 7.1 and 7.2 of the Payment Bond required that QBE "send an answer to the Claimant, with a copy to [Inovateus], within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are dispute;" and "pay or arrange for payment of any undisputed amounts."  (Ex. 3).

88.     QBE did not send an answer within 60 days after receipt of Inovateus' notice of the Subcontractor Claims, which caused Inovateus to incur additional legal fees, expenses, and other costs.

89.     QBE ultimately did accept and pay a part of or all of some Payment Bond claims, except for the following (the "Remaining Payment Bond Claims"):

      a.   Triad Inc. America, in the amount of $106,264.04;

      b.   Elliott & Wood, Inc., in the amount of $108,710.55;

      c.   American Wire Group, in the amount of $14,650.00; and

      d.   Chastain & Associates, in the amount of $788.00.

90. The Remaining Payment Bond Claims total $230,412.59.

91. Inovateus agreed to pay $36,561.00 in order to satisfy the claim by Catalyst's subcontractor Terrace Fence for unpaid amounts under its subcontract with Catalyst.

92. Inovateus paid $2,250.00 to WastEx for dumpsters used after Catalyst's termination.

93. Some of the subcontractors of Catalyst on the Clendenin Project recorded liens against the Owner or the Facility (the "Liens").

94. Inovateus provided Catalyst and QBE with notice of the Liens and requested that they be bonded over or otherwise released within 30 days, pursuant to the Payment Bond.

95. Neither Catalyst nor QBE bonded off or otherwise released any of the Liens within 30 days following receipt of notice from Inovateus. However, QBE subsequently caused the release of some Liens, except for those Liens recorded by Triad Inc. America in the amount of $106,264.06, and Elliott & Wood, Inc. in the amount of $74,185.00. Those remaining liens total $180,449.06.

96. Inovateus has incurred attorney fees, expenses, and other costs as the result of Catalyst and QBE's failure to timely resolve or defend and indemnify Inovateus from the Subcontractor Claims and Liens.

**INDEMNIFICATION**

97. In §10.1 of the MSA, Catalyst: "expressly agrees to defend…, indemnify and save harmless [Inovateus] [and] Owner,… against any and all claims, suits, liability, loss, fines, penalties, damage and expense of any kind whatsoever, including court costs and attorney's fees,… on account of… damages or loss to… property… caused by, or in any way arising out of or resulting from, directly or indirectly, (a) the breach by [Catalyst] (or anyone directly or

indirectly employed or engaged by [Catalyst] or anyone for whose acts [Catalyst] may be liable) or the failure by [Catalyst] or any such person to perform any of its covenants or obligations under this Master Agreement or the Contract Documents, and/or (b) any negligent acts or omissions of [Catalyst], its employees, agents, lower-tier subcontractors, suppliers or anyone for whose acts [Catalyst] may be liable . . ..." (Ex. 1).

98.     In §6.2 of the MSA, Catalyst "agrees that it is fully liable and responsible for any Work performed by [Catalyst's] lower-tier subcontractors or suppliers, including, but not limited to, the actual or alleged breach of [the MSA] or failure to perform by such lower-tier subcontractors or suppliers." (Ex. 1).

99.     Catalyst's breaches of the Subcontract include:

a.      Failure to complete the Work under the Master Subcontract Agreement by the Guaranteed Mechanical Completion Date and the Guaranteed Substantial Completion Date;

b.      Refusing or neglecting to supply adequate and competent supervision or the sufficiency of properly skilled workmen or materials and of the proper quality or quantity;

c.      Failing to prosecute the work with promptness and diligence or otherwise in accordance with the contract documents;

d.      Failing to perform the covenants or obligations contained in the MSA;

e.      Providing work under the MSA that was defective or otherwise not in conformity with the Master Subcontract Agreement;

f.      Failing to provide labor, tools, equipment, materials, supplies, utilities, transportation, and supervision and to do all things necessary to perform and complete the work and services described in the Subcontractor Agreement in a good and workmanlike manner in accordance with the Contract Documents;

g.      Providing installation activity that was not done in a professional, neat, and workmanlike manner, nor in compliance with all applicable federal, state, and local codes;

h.      Failing to install the panels in a professional, neat, and workmanlike manner on the racks, installed and secured per the Manufacturer's Installation Guide Specifications, and damaging panels during the installation;

i.      Failing to perform the Work in accordance with Prudent Industry Practices;

j.      Failing to keep the structure, improvements, and real estate of the Kern Project free from all mechanic's and other liens and from any claim against the Contract proceeds.

k.      Failing to timely remove the lien claims;

l.      Failing to timely defend Inovateus from the liens, and to timely remove and discharge any such lien, claim, or other encumbrance on the equipment, facility, work, or the Kern Project site.

m.      Failing to pay for all materials, machinery, equipment, and labor used in or in connection with the MSA;

n.      Failing to pay its subcontractors for work on the Kern Project that was covered by Pay Applications that Inovateus had paid;

o.      Failing to timely pay the subcontractors;

p.      Failing to pay the remaining Payment Bond Claims;

q.      Allowing its subcontractors to record liens on the Project, and failing to timely bond off or otherwise release such liens; and

r.      Failing to defend, indemnify and save harmless Inovateus against claims, liability, damage, and expense arising out of Catalyst's breach of the MSA, and any negligent acts or omissions of Catalyst for those for whose acts Catalyst may be liable.

## PAYMENT BOND AND PERFORMANCE BOND

100.    The Subcontract required Catalyst to obtain and provide the Payment Bond and the Performance Bond for the Clendenin Project to guarantee Catalyst's performance obligations under the MSA, and ensure the payment obligations of Catalyst to its subcontractors and materialmen that were engaged for the Clendenin Project.

101.   At the request of Catalyst, QBE, as surety, issued the Payment Bond and Performance Bond on behalf of Catalyst as "Principal," and for the benefit of Inovateus, as "Obligee."

102.   In the §1 of the Payment Bond, Catalyst and QBE "jointly and severally, bind themselves . . . to [Inovateus] to pay for labor, materials, and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference," subject to the terms of the Payment Bond.  (Ex. 3).

103.   Payment Bond §7.3 states that if QBE "fails to discharge its obligations under §7.1 or §7.2, [QBE] shall indemnify the Claimant for the reasonable attorneys' fees the Claimant incurs thereafter and recover any sums found to be due and owing to the Claimant."  (Ex. 3).

104.   The Performance Bond §1 states that Catalyst and QBE "jointly and severally, bind themselves . . . to [Inovateus] for the performance of the Construction Contract, which is incorporated herein by reference."  (Ex. 4).

105.   QBE and Catalyst have breached their obligations under the Payment Bond and Performance Bond by failing to pay for the labor, materials, and equipment furnished for use in the performance of the MSA, and by not paying for the performance of the MSA.

## DAMAGES

106.   In §7.2(b) of the MSA, Catalyst and Inovateus agreed that in the event Inovateus terminated the MSA by reason of default, and Inovateus elected to employ another entity to finish the Work, then Inovateus would be entitled to withhold the unpaid balance of the MSA from Catalyst, and if the cost to finish the Work and bring it in conformity with the Contract Documents, plus any other costs and damages sustained by Inovateus by reason of such failure or lack of

performance by Catalyst, including Inovateus' attorneys' fees and expenses, exceeded the Contract balance, then such excess shall be paid by Catalyst to Inovateus.  (Ex. 1).

107.    Inovateus's damages to date are at least $595,245.51 (the "Damages"), and include:

    a.    $124,344.46 in payments to ISI to complete the Work within the scope of the MSA and bring it into conformity with the MSA, after Catalyst was terminated;

    b.    $348,173.05 in liquidated damages incurred by Inovateus;

    c.    $38,811.00 incurred to resolve claims by Terrace Fence and WastEx for subcontractor work that fell within the scope of the MSA; and

    d.    Legal fees and expenses of more than $83,917.00 to date.

108.    After the $288,798.09 Remaining Contract Balance is deducted from the Damages to date, the total is $306,447.42.

109.    Inovateus has incurred additional damages for costs and expenses, including time and travel of its personnel to assist in completing the Work and bringing it into conformity with the MSA, and will incur additional costs and expenses, including legal fees.

110.    Inovateus will also incur additional damages, including legal fees, as the result of the Remaining Subcontractor Claims and the Liens recorded by Triad Inc. America and Elliott & Wood, Inc.

111.    In §12.4 of the MSA, Catalyst and Inovateus agreed that in any instance whereby Inovateus is entitled under the terms of the MSA to recover any monies from Catalyst, Inovateus shall be entitled to recover from Catalyst: (a) interest "at the lesser of twelve percent (12%) per annum or the highest rate permitted by law, from the date due until paid; (b) reasonable attorneys' fees and related costs …; and (c) all court costs, fees paid to experts, arbitration fees and like expenses." (Ex. 1).

## <u>COUNT I:  BREACH OF THE PAYMENT BOND AND PERFORMANCE BOND</u>

112.    Inovateus incorporates by reference the allegations in Paragraphs 1 through 111 of this Complaint, as Count I, Paragraph 112.

113.    QBE bound itself to Inovateus under the Payment Bond to pay for labor, materials, and equipment furnished for use in the performance of the Subcontract.

114.    QBE bound itself to Inovateus under the Performance Bond for the performance of the Subcontract.

115.    QBE failed and refused to defend, indemnify, and reimburse Inovateus according to the Payment Bond and the Performance Bond.

116.    QBE failed to resolve or bond over the Subcontractor Claims and the Liens pursuant to the terms of the Payment Bond.

117.    QBE's breaches of its obligations under the Payment Bond and the Performance Bond have caused Inovateus to incur the Damages, and will cause Inovateus to incur additional Damages in the future.

WHEREFORE, Plaintiff Inovateus Solar, LLC requests that the Court grant judgment in its favor and Defendant QBE Insurance Corporation in the principal amount of at least $306,447.42, plus additional damages that accrue, including any amounts paid to resolve subcontractor claims or liens, attorneys' fees, court costs, and expenses, and prejudgment interest at the rate of 12% per annum, and for all the relief that the Court deems just and proper.

Respectfully submitted,


/s/Paul Olszowka
Attorney for Plaintiff,
Inovateus Solar, LLC

Paul Olszowka, Esq.  (6291267)
BARNES & THORNBURG, LLP
One North Wacker Drive, Ste. 4400
Chicago, IL 60603
(312) 357-1313
Fax: (312) 759-5646
Paul.Olszowka@btlaw.com

22282263v1